## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **WILLIAM B. BREWER,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:17cv00022 |
| | ) | **REPORT AND RECOMMENDATION** |
| **NANCY A. BERRYHILL,** | ) | |
| **Acting Commissioner of** | ) | By:  PAMELA MEADE SARGENT |
| **Social Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |

*I. Background and Standard of Review*

Plaintiff, William B. Brewer, ("Brewer"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011, West 2012 & 2018 Supp.). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642

(4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Brewer protectively filed his applications for DIB and SSI[1] on February 14, 2013, alleging disability as of July 12, 2012, due to residuals from fractures in his back, neck, pelvis and shoulders; high blood pressure; arthritis; pain in his back and legs; depression; anxiety; and difficulty focusing and attending to tasks. (R. at 15, 220-21, 234, 238, 259, 276.) The claims were denied initially and upon reconsideration. (R. at 149-51, 156-57, 160-62, 164-69, 171-73.) Brewer then requested a hearing before an ALJ. (R. at 175-76.) The ALJ held a video hearing on February 17, 2016, at which Brewer was represented by counsel. (R. at 33-71.)

By decision dated May 2, 2016, the ALJ denied Brewer's claims. (R. at 15-26.) The ALJ found that Brewer met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2016.[2] (R. at 17.) The ALJ found that Brewer had not engaged in substantial gainful activity since July 12, 2012, the alleged onset date. (R. at 17.) The ALJ found that the medical evidence established that Brewer had severe impairments, namely residuals from fractures sustained in a motor vehicle accident in 2006; right ankle sprain; degenerative changes of the cervical/lumbar spine; obesity; depressive disorder; anxiety disorder; and cognitive disorder, but she found that Brewer did not have an

---

[1] Brewer's SSI application is not contained in the record. However, it is referenced in the ALJ's decision. (R. at 15.)

[2] Therefore, Brewer had to show that he was disabled between July 12, 2012, the alleged onset date, and May 2, 2016, the date of the ALJ's decision, in order to be eligible for DIB benefits.

impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17-18.) The ALJ found that Brewer had the residual functional capacity to perform light work[3] that did not require crawling, climbing of ladders, ropes or scaffolds, working on vibrating surfaces, around unprotected heights or hazardous machinery; that did not require more than frequent overhead reaching; that did not require more than occasional pushing, pulling, balancing, kneeling, stooping, crouching and climbing of ramps and stairs; and that did not require concentrated exposure to extremely cold temperatures. (R. at 20.) The ALJ also found that, since September 2014, restrictions imposed by mental impairments resulted in limitations to understanding, remembering and carrying out simple instructions in repetitive, unskilled work that involved no more than occasional interaction with the general public. (R. at 20.) The ALJ found that Brewer was not able to perform his past relevant work. (R. at 24.) However, based on Brewer's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Brewer could perform, including jobs as a marker, a delivery router and a sorter. (R. at 25.) Thus, the ALJ concluded that Brewer was not under a disability as defined by the Act, and was not eligible for DIB or SSI benefits. (R. at 26.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2018).

After the ALJ issued her decision, Brewer pursued his administrative appeals, (R. at 7-10), but the Appeals Council denied his request for review. (R. at 1-5.) Brewer then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, he also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2018).

404.981, 416.1481 (2018). This case is before this court on Brewer's motion for summary judgment filed January 5, 2018, and the Commissioner's motion for summary judgment filed February 2, 2018.

## II. Facts

Brewer was born in 1981, (R. at 38, 220), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Brewer has a high school education with approximately one year of college instruction and past relevant work as a user support analyst, a production worker in a mattress factory and a stock clerk in a grocery store. (R. at 38-42, 59, 239.) Brewer stated that he last worked in November 2011 in a mattress factory, but was fired from that job. (R. at 38-39.) He stated that he suffered multiple severe injuries from a motor vehicle accident in 2006, including multiple fractures, memory loss, continued difficulty walking and standing and pain in the hips, back, shoulders neck and ankles. (R. at 42-43.) He opined that he could lift up to five pounds, walk only 15 steps before having to stop for a minute and sit for only 10 minutes before having pain in his back and hip, and he could stand for five minutes. (R. at 40, 43-44.) Brewer stated that he could not raise his arms due to radiating bilateral shoulder pain, he could not walk even very short distances due to right hip pain that radiated down the back of his leg, being on his feet caused his ankles to hurt and his leg to go numb, bending over and picking things up was extremely hard due to shooting pain in his back and hips, and he could not squat due to his ankles. (R. at 53-55.) Brewer stated that he had to stretch out and lie down or recline for up to six hours per day. (R. at 52-53.) He testified that he was receiving treatment at Simpson Pain Management Clinic and had increased his pain medicine over time. (R. at 51-52.)

Brewer testified that he had been seeing a counselor for about six to eight months for depression and anxiety. (R. at 44.) However, he stated that he had not been hospitalized or presented to the emergency room because of his depression or anxiety. (R. at 45.) Brewer explained that he did not have the drive to do anything, and being around large crowds caused him stress and overwhelmed him. (R. at 45-46.) He stated that he stayed sad, he did not feel like he "fit," and he felt worthless. (R. at 50.) Brewer also stated that he did not handle stress well and that he became angry. (R. at 50-51.) He stated that he experienced panic attacks, feeling "completely stressed out" and like "everything [was] just crashing down on [him]." (R. at 57.) He stated that he took sleep medication and pain medication. (R. at 46.) Brewer testified that his pain medication helped, but made him drowsy and caused stomach issues. (R. at 58.) Brewer stated that he mostly stayed at home, lying around watching television and doing small things around the house, including picking up his things. (R. at 47, 51.) He denied doing household chores or yard work. (R. at 47.) Brewer stated that he could use the microwave to prepare meals, and he could drive short distances. (R. at 48.) Brewer stated that he occasionally read the newspaper, but had difficulty focusing and remembering. (R. at 49-50.) He stated that he moved back in with his mother following the motor vehicle accident. (R. at 49, 51.) Brewer stated that she did his laundry and prepared his meals. (R. at 51.)

Mark Hileman, a vocational expert, was present and testified at Brewer's hearing. (R. at 58-68.) Hileman was asked to consider a hypothetical individual of Brewer's age, education and work history, who had the residual functional capacity to perform light work; who could occasionally push/pull, climb ramps and stairs, balance, kneel, stoop and crouch; never crawl, climb ladders, ropes or scaffolds, work at unprotected heights, work on vibrating surfaces or be exposed to hazardous machinery; frequently, but not constantly, reach overhead; and who

must avoid concentrated exposure to extremely cold temperatures. (R. at 62.)
Hileman testified that such an individual could perform Brewer's past work as a
user support analyst, as well as other jobs existing in significant numbers in the
national economy, including those of a delivery router, a cashier II and a marker.
(R. at 62-63.) Hileman next was asked to consider the same hypothetical
individual, but who also was limited to understanding, remembering and carrying
out simple instructions and performing repetitive, unskilled work that involved
only occasional interaction with the general public. (R. at 63.) Hileman testified
that such an individual could not perform any of Brewer's past work, but could
perform the jobs of a marker, a delivery router and a sorter. (R. at 63-64.) Hileman
next was asked to consider a hypothetical individual with the same mental
limitations previously enumerated, but with the physical limitations set out in Dr.
Young's December 4, 2015, assessment. (R at 64, 876-78.) Hileman testified that
such a hypothetical individual could perform neither Brewer's past work nor any
other work existing in significant numbers in the national economy. (R. at 64-65.)
Hileman also was asked to consider the first hypothetical individual, but who also
would be off task more than 10 percent of the workday due to severe pain, thereby
affecting his ability to focus and concentrate. (R. at 65.) Hileman testified that an
employer would not tolerate being off task to such a degree. (R. at 65-66.)
Likewise, Hileman testified that being absent from work two days monthly would
eliminate substantial gainful employment. (R. at 66.) Hileman testified that an
individual who could bend, stoop, squat, kneel and crawl less than occasionally
also could not perform substantial gainful activity. (R. at 66.) He also testified that
an individual who could not use his hands and arms for repetitive functions for
one-third of the workday could not perform substantial gainful activity. (R. at 67.)
Likewise, Hileman testified that an individual who had a severe limitation,
resulting in unsatisfactory work performance, in his ability to follow even simple
work rules could not perform substantial gainful activity. (R. at 67-68.)

In rendering her decision, the ALJ reviewed records from Lee Co. Public Schools; Wellmont Holston Valley Medical Center, ("Holston Valley"); Highlands Pathology Consultants; Kristie J. Nies, Ph.D.; First Choice Neurosurgery; Appalachian Orthopaedic Associates, P.C., ("Appalachian Orthopaedics"); Litton Family Medicine; Wellmont Medical Associates Pain Management; Luc Vinh, a state agency medical consultant; Daniel Walter, Psy.D., a state agency psychologist; Dr. Robert McGuffin, M.D., a state agency physician; Southeastern Pain Management Center, PLL; Robert Spangler, Ed.D., a licensed clinical psychologist; Lee Regional Medical Center; Dr. Dennis Aguirre, M.D.; Lee Co. Behavioral Health Services; Brandon Bogle, Ph.D., a licensed clinical psychologist; Ava Martin, PMHNP-BC; Pennington Family Health Center; Dr. Leigh Young, M.D.; Simpson Clinic, LLC; Dr. Joshua Yeary, D.O.; and Jonesville Family Medical Center.

Brewer was treated at Holston Valley on November 18, 2006, after being involved in a motor vehicle accident. (R. at 325-40.) Brewer suffered multiple injuries, including bilateral lung contusions, left apical hemothorax, multiple rib fractures, right scapula fracture, sternal fracture, diffuse brain swelling, contusions on the brain, skull fracture and pelvic fractures. (R. at 325-40.) However, all fractures were deemed stable and not in need of surgical intervention. (R. at 412.) On November 28, 2006, he underwent a tracheostomy. (R. at 382.) He began physical rehabilitation while hospitalized and began "recovering nicely." (R. at 414.) Brewer was hospitalized through December 6, 2006. (R. at 414-15.) At the time of discharge, Brewer had "progressed quite well," and he was ambulating with a walker, he did not have a tracheostomy and was mentating "fine." (R. at 414.)

On March 28, 2007, during a neuropsychological evaluation, Brewer stated that his memory was "not that different than before." (R. at 420.) He denied forgetting conversations and misplacing items, and he denied change in attention or language. (R. at 420.) Brewer also denied functional limitations. (R. at 420.) He reported recently returning to driving. (R. at 420.) He reported his pain on that day as a two to three out of 10. (R. at 421.) He denied depression and anxiety. (R. at 421.) Brewer's mother reported that Brewer was more easily agitated than before and that he got depressed at times and had some changes in attention and memory, but "nothing major." (R. at 421.) Kristie J. Nies, Ph.D., a clinical neuropsychologist, diagnosed Brewer with a cognitive disorder, not otherwise specified; and a closed head injury. (R. at 423.) She recommended a return to work after May 1, 2007, pending the approval of Dr. Larry Hartman, M.D. (R. at 423.)

An MRI of Brewer's lumbar spine, dated April 10, 2009, showed mild spondylosis with no radiculopathic lesions. (R. at 637-38.) During follow-up treatment with Dr. Hartman, a neurosurgeon, and Dr. Daniel F. Klinar, M.D., an orthopedist, it is noted that Brewer's condition improved. On April 16, 2007, treatment notes from both Dr. Hartman and Dr. Klinar indicate that Brewer was released to return to work without restrictions on April 23, 2007. (R. at 425, 434.) At that time, Dr. Hartman noted that Brewer ambulated without difficulty, and he was "doing well." (R. at 425.) On May 16, 2007, Brewer had returned to work, and he denied any difficulties. (R. at 424.) He continued to do well and had returned to most of his activities without problems. (R. at 424.) He ambulated without difficulty, and Dr. Hartman stated that Brewer may continue working without restrictions. (R. at 424.) On July 16, 2007, Dr. Klinar noted that Brewer's injuries appeared to be doing well. (R. at 433.)

On August 27, 2009, Brewer saw Dr. John Litton, M.D., reporting significant back pain. (R. at 464-66.) He denied anxiety, depression or sleep disturbance. (R. at 464.) Brewer reported exercising three to four days weekly. (R. at 464.) He was diagnosed with low back pain, he received Lortab, and he was referred to a chronic pain specialist. (R. at 465-66.) When Brewer saw Dr. Litton on November 10, 2010, he had full range of motion of the neck, a normal gait, and he was alert and fully oriented with appropriate affect and demeanor. (R. at 468.)

Brewer was involved in another motor vehicle accident on June 9, 2011, in which he injured his right ankle and right knee. (R. at 432.) However, the following day, he reported to Brandon Jones, a physician's assistant at Appalachian Orthopaedics, that he was not in much pain. (R. at 432.) By June 24, 2011, he stated that he was "doing great," and Dr. Klinar diagnosed improving right ankle sprain. (R. at 431.) Brewer presented to Holston Valley on November 20, 2011, after yet another motor vehicle accident, complaining of bilateral knee pain and facial injuries. (R. at 438-44, 477.) He had contusions to both knees and an abrasion to the left eye. (R. at 439.) A CT scan of the face showed no fractures. (R. at 443.)

On May 12, 2012, Brewer returned to Dr. Litton. (R. at 470-73.) He denied anxiety or depression. (R. at 470.) He reported running, walking and weight lifting three to four days weekly. (R. at 470.) A physical examination revealed a normal gait, grossly normal tone and muscle strength, full, painless range of motion of all major muscle groups and joints, no laxity or subluxation of any joints, no masses, effusions, misalignment, crepitus or tenderness in any major joint and intact cranial nerves. (R. at 471.)

Brewer was treated by Dr. Dennis Aguirre, M.D., at Southeastern Pain Management Center, PLL, from July 2011 through March 2013. (R. at 484-534.) During the time period relevant to this court's consideration, Brewer complained of low back pain, bilateral leg pain, bilateral shoulder pain, neck pain and soreness, bilateral thigh pain and hip pain. (R. at 484, 486, 488, 490, 492, 494, 500, 502.) Dr. Aguirre diagnosed Brewer with low back pain, lumbar radiculopathy and cervical radiculopathy. (R. at 485, 487, 489-90, 493, 495, 499, 501, 503.) In May, July and September 2012, Brewer was fully oriented, alert and cooperative, well groomed and in no acute distress, he had a normal mood and affect, normal judgment and insight, normal speech, normal thought processes/cognitive function, intact language, appropriate fund of knowledge and no impairment in long-term or short-term memory. (R. at 498, 501-02.) He had a normal gait and normal posture. (R. at 502.) During this four-month period, Dr. Aguirre prescribed oxycodone, Roxicodone and Opana. (R. at 499, 501, 503.) Also during this time, Brewer stated that his prescriptions were working "fine" and that he was "doing well" with his current medication regimen. (R. at 498, 500.) Beginning in November 2012, and continuing through March 2013, Dr. Aguirre noted that Brewer had an antalgic gait, but he continued to have normal posture and be in no acute distress. (R. at 484, 486, 488, 492, 494.) During the same time, Dr. Aguirre noted that Brewer's mood and affect were anxious. (R. at 484, 487-88, 493, 495.) Brewer's diagnoses over this time included low back pain, lumbar radiculopathy and cervical radiculopathy. (R. at 485, 487, 489-90, 493, 495.) In November 2012, Brewer again stated that he was doing well with his current regimen, and Dr. Aguirre indicated that Brewer had multiple family stressors. (494-95.) In December 2012, after being in a motor vehicle accident a couple of weeks previously, Brewer stated that his pain medications were doing "ok" and that his current regimen was effective. (R. at 492.) Physical examination at that time revealed full strength and normal reflexes in the upper extremities. (R. at 493.) Brewer exhibited tenderness

without swelling or instability of the cervical spine, and there was spasticity with palpation, left greater than right. (R. at 493.) X-rays of the cervical spine, dated December 28, 2012, showed nominal spondylosis. (R. at 512-13.) Again, on December 31, 2012, Brewer reported that his medication was helping. (R. at 490.) Dr. Lesco Rogers, M.D., noted that Brewer's neck symptoms were progressively improving. (R. at 490.)

In January 2013, Brewer stated that his medications were working "alright." (R. at 488.) Dr. Aguirre ordered a cervical MRI, and he refilled Brewer's medications. (R. at 489.) In February 2013, Brewer stated that his medications were working, but not lasting long enough. (R. at 486.) Dr. Aguirre prescribed Zanaflex. (R. at 487.) He noted that Brewer had been experiencing tachycardia for several months, and his blood pressure was elevated to 160/102. (R. at 486-87.) However, Brewer had no insurance and could not afford additional testing. (R. at 487.) Dr. Aguirre recommended he go to his primary care doctor for an EKG and to obtain paperwork to apply for medical assistance. (R. at 487.) In March 2013, Brewer reported having pain between medication times. (R. at 484, 553.) His blood pressure was 143/92. (R. at 484, 553.) Dr. Aguirre continued Brewer's medications, and he noted that an EKG showed a right bundle branch block. (R. at 485, 510, 554-55.)

Brewer continued to receive pain management from Dr. Aguirre from April 2013 through September 2013. (R. at 541-51.) In April 2013, he had a normal gait and an anxious mood and affect. (R. at 550-51.) He reported that his pain medications were doing well, and he stated that he was more active and walking a mile or so daily, performing light yard work and was less irritable. (R. at 550.) Brewer reported that his pain was aggravated by cold weather. (R. at 550.) He was diagnosed with joint pain involving multiple sites and lumbar radiculopathy, and

he was continued on his medications and home conditioning program. (R. at 551.) In June 2013, Brewer continued to report that his pain medications were doing well and that he was being more active. (R. at 548.) He had an antalgic gait and an anxious mood and affect. (R. at 549.) The remainder of the examination was normal. (R. at 549.) Brewer reported being very stressed due to family issues. (R. at 549.) Dr. Aguirre diagnosed lumbar radiculopathy and joint pain involving multiple sites. (R. at 549.) Brewer was continued on oxycodone. (R. at 549.)

In July 2013, Brewer again reported that his medication worked. (R. at 546.) His physical and mental status examinations were unchanged from his previous visit. (R. at 546-47.) Dr. Aguirre diagnosed lumbar radiculopathy, but he noted that Brewer was doing well and continued him on oxycodone and Zanaflex, as well as a conditioning program. (R. at 547.) In August 2013, Brewer reported that his medications were effective with no adverse side effects. (R. at 544.) He stated that he was able to tolerate housekeeping and yard work, and he was less irritable. (R. at 544.) Brewer had an antalgic gait and an anxious mood and affect. (R. at 545.) The remainder of the examination was normal. (R. at 545.) Dr. Aguirre diagnosed joint pain involving multiple sites and continued his medications. (R. at 545.)

In September 2013, Brewer reported that his current regimen was effective and adequate. (R. at 543.) He again stated that he could tolerate housekeeping and yard work and was less irritable. (R. at 543.) Dr. Aguirre diagnosed low back pain. (R. at 543.) Later that same month, Brewer reported increased joint pain, complaining of pain in the lower back, shoulders and right elbow. (R. at 541.) However, he stated that his pain medications were doing well. (R. at 541.) Brewer again reported an ability to tolerate housekeeping and yard work and being less irritable. (R. at 541.) He stated that his pain was relieved by nonopioid analgesics, rest and lying down and was aggravated by all physical activity. (R. at 541.) His

physical and mental status examinations remained unchanged from the prior visit, and he was diagnosed with cervical radiculopathy. (R. at 542.) Dr. Aguirre continued Brewer's medications and added Voltaren gel. (R. at 542.)

On September 25, 2013, Luc Vinh, a state agency medical consultant, completed a residual functional capacity assessment of Brewer, finding that he could perform light work that required no more than frequent climbing of ramps/stairs, frequent balancing, occasional climbing of ladders/ropes/scaffolds, stooping, kneeling, crouching and crawling, and which did not require concentrated exposure to hazards, such as machinery and heights. (R. at 107-08, 115-16.)

In October 2013, Brewer returned to Dr. Aguirre, again reporting that his medications were effective with no adverse side effects. (R. at 563.) He stated that he was grieving over the loss of a good friend. (R. at 563.) Brewer reported that he could tolerate housekeeping and yard work and was less irritable. (R. at 563.) He noted that his pain was relieved by rest, nonopioid analgesics and lying down, but was aggravated by all physical activity. (R. at 563.) It was noted that Brewer was looking for work. (R. at 563.) He reported pain in the center of his low back, bilateral hip stiffness, neck pain and right shoulder pain. (R. at 563.) He had an antalgic gait and an anxious mood and affect. (R. at 564.) The rest of his examination was normal. (R. at 564.) Dr. Aguirre diagnosed cervical radiculopathy and continued Brewer's medications. (R. at 564.) In November 2013, Brewer reported increased pain with cold weather, but he stated that his pain medications were doing well. (R. at 561.) He stated that he was able to tolerate housekeeping and yard work. (R. at 561.) He again complained of pain in the center of his back, joint stiffness in both hips, neck pain and right shoulder pain. (R. at 561.) He had an antalgic gait and an anxious mood and affect. (R. at 562.) The remainder of his

examination was normal. (R. at 562.) Brewer reported that he planned to go to the gym. (R. at 562.) He was diagnosed with lumbar radiculopathy and low back pain, and he was continued on oxycodone. (R. at 562.)

In January 2014, Brewer stated that he was doing well with his current medication regimen. (R. at 616.) Dr. Aguirre noted that Brewer's back pain had gradually worsened since his 2006 motor vehicle accident and that it radiated into his right hip and right leg. (R. at 617.) He rated his pain as an eight on a 10-point scale, which was moderate. (R. at 617.) Brewer reported back pain, muscle cramps and stiffness, right hip pain, right leg pain and left shoulder pain. (R. at 617.) He also reported depression over being unemployed. (R. at 617.) Brewer was not nervous or anxious. (R. at 617.) On examination, he was alert, fully oriented, cooperative and in no distress, and his mood and affect, behavior, judgment, thought content, memory and cognition all were normal. (R. at 618.) Dr. Aguirre diagnosed lumbar radiculopathy, and he continued him on medication. (R. at 618.) In February 2014, Brewer reported that cold weather made his pain a little worse, but that his medications were effective. (R. at 608.) He stated that he could do light housekeeping and that he was less irritable. (R. at 608.) Brewer reported constant back pain, which he rated an eight on a 10-point scale. (R. at 608.) He stated that his symptoms were aggravated by twisting, sitting, lying down, bending and stress and that analgesics, walking, heat and ice provided moderate relief. (R. at 608.) Brewer's blood pressure was 140/92. (R. at 609.) He was alert, oriented and in no distress with a normal mood and affect, normal behavior and normal judgment and thought content. (R. at 609.) He had tenderness in the lumbar area. (R. at 609.) Dr. Aguirre diagnosed lumbar radiculopathy, and he refilled his medication. (R. at 610.) He noted that Brewer planned to return to school in the summer or fall. (R. at 610.) In March 2014, Brewer reported that he was tolerating his medications well without adverse side effects. (R. at 597.) He reported trying to do things around the

house. (R. at 597.) Brewer reported back pain, muscle cramps and stiffness, which was exacerbated two weeks previously and lasted for four days. (R. at 598.) He also complained of right hip and right leg pain, as well as depression due to his work situation. (R. at 598.) Brewer was not nervous or anxious. (R. at 598.) He was alert, oriented, cooperative and in no distress, he had a normal gait, and his mood and affect, behavior, judgment, thought content, cognition and memory all were normal. (R. at 599.) He was diagnosed with joint pain at multiple sites and lumbar radiculopathy. (R. at 599.) In April 2014, Brewer reported doing well with his current medication regimen. (R. at 588.) He rated his pain as a seven on a 10-point scale. (R. at 588.) Brewer complained of arthritis, back pain, right hip pain, joint pain and bilateral shoulder pain, right greater than left. (R. at 588-89.) He was alert, fully oriented and cooperative, and his mood and affect, behavior, judgment, thought content, cognition and memory all were normal. (R. at 589.) Brewer had a normal gait. (R. at 589.) Dr. Aguirre noted that Brewer was able to do yard work and his activities of daily living, and he had been less irritable with pain medication. (R. at 589.) Dr. Aguirre diagnosed lumbar radiculopathy, and he refilled his Roxicodone. (R. at 589.) Later that month, Brewer stated that he was doing fine, and he rated his pain level as a seven on a 10-point scale. (R. at 578.) He reported back pain and shoulder pain and stiffness. (R. at 578.) Brewer also reported depression due to being unemployed, but he was not nervous or anxious. (R. at 579.) He was alert, oriented and cooperative, he was in no distress, and his mood and affect, behavior, judgment, thought content, cognition and memory all were normal. (R. at 580.) Brewer had an abnormal gait. (R. at 580.) Dr. Aguirre diagnosed lumbar radiculopathy, and he continued Brewer on medication. (R. at 580.)

On May 28, 2014, Daniel Walter, Psy.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding that Brewer

had no medically determinable mental impairment. (R. at 128, 141.) He explained that Brewer's medical history established a diagnosis of cognitive disorder due to a closed head injury prior to the alleged onset date of disability, but Brewer had made good progress, and a re-evaluation was not necessary. (R. at 128, 141.) Walter further noted that evidence from the alleged onset date to the time of the PRTF did not indicate a mental diagnosis or prescribed medication, and, while Brewer reported depression, it was situational. (R. at 128, 141.) The mental status examinations in the record did not indicate serious mental status abnormalities. (R. at 128, 141.)

Also on May 28, 2014, Dr. Robert McGuffin, M.D., a state agency physician, completed a residual functional capacity assessment, making identical findings to those of medical consultant Vinh. (R. at 129-31, 142-44.)

In June 2014, Brewer returned to Dr. Aguirre, reporting lumbar spinal pain that radiated to the right knee and right thigh, but he stated that his medications were doing ok. (R. at 658.) He stated that he was able to do yard work and housework, and he was less irritable with pain medication. (R. at 658.) Brewer stated that he needed to get out more. (R. at 658.) He rated his pain as a seven on a 10-point scale, indicating moderate pain. (R. at 658.) Brewer endorsed depression over being unemployed, but he denied being nervous or anxious. (R. at 659.) Dr. Aguirre noted that Brewer was alert, oriented, cooperative and in no distress with normal behavior, judgment, thought content, cognition and memory and a depressed, but not anxious, mood. (R. at 660.) He had an abnormal gait. (R. at 660.) Brewer reported plans to attend college in the fall. (R. at 660.) Dr. Aguirre diagnosed lumbar radiculopathy and continued with the current medical regimen. (R. at 660.) In August 2014, Brewer continued to complain of back pain, which he rated as a seven on a 10-point scale. (R. at 841-42, 845.) However, he reported that

his pain medication was doing ok, and he stated that he was able to do some work around the house. (R. at 842, 845.) He also stated that he was less irritable with pain medication. (R. at 842, 845.) Brewer had a normal gait, he was alert, oriented and in no distress. (R. at 844, 847.) His mood and affect were normal, as were his behavior, thought content and judgment, and he was not anxious. (R. at 844, 847.) He was continued on his current regimen. (R. at 844, 848.)

Brewer saw Robert Spangler, Ed.D., a licensed clinical psychologist, on September 2, 2014, for a psychological evaluation at his counsel's referral. (R. at 629-32.) He reported driving locally about twice weekly. (R. at 629.) Brewer was cooperative and had no speech difficulties. (R. at 629.) He had awkward gross motor movements and a slow, stiff gait. (R. at 629.) He also had awkward fine motor movements. (R. at 629.) His general activity level was slow. (R. at 629.) Spangler noted that school records indicated IQ testing when Brewer was six years old yielded a verbal IQ score of 117. (R. at 630.) Brewer seemed socially confident, but he frequently needed instructions repeated, and he had difficulty remembering instructions. (R. at 629.) He demonstrated good concentration, and he was appropriately persistent on tasks. (R. at 629.) Brewer's pace was impacted, and he stood frequently between tasks. (R. at 629.) He was alert and fully oriented with adequate recall of remote events, but inadequate recall of recent events. (R. at 630.) Brewer's motor activity was calm, his affect was appropriate, his mood was euthymic, and he was cooperative, compliant and forthcoming. (R. at 630.) He performed serial sevens adequately, he could interpret common proverbs adequately, and there were no illogical or loose associations. (R. at 630.) He could spell the word "world" both backwards and forwards. (R. at 630.) His judgment and insight were consistent with high average intelligence. (R. at 630.) His stream of thought was unremarkable, associations were logical, and thought content was nonpsychotic, but perceptual abnormalities were noted. (R. at 630.) Brewer

appeared to be functioning in the high average to superior range of intelligence and was emotionally stable. (R. at 630.) Delusional thought was not evident. (R. at 630.)

Brewer reported that his mother did the cooking, cleaning, laundry and grocery shopping. (R. at 630.) He stated that a neighbor did the yard work and that he and his mother cared for two dogs. (R. at 630.) Brewer reported that he watched television. (R. at 630.) Brewer's social skills were adequate, and he related well with Spangler. (R. at 630.) Spangler found that, due to memory impairment, Brewer did not have the judgment necessary to handle his financial affairs if awarded benefits. (R. at 631.) The Wechsler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), was administered, on which Brewer obtained a verbal comprehension index score of 100 and a full-scale IQ score of 93, placing him in the average range of intelligence. (R. at 631.) The Wide Range Achievement Test – Fourth Edition, ("WRAT-4"), also was administered, on which Brewer tested at the 10.8 grade level in word reading, the 12.9+ grade level in sentence comprehension and the 6.9 grade level in arithmetic computation. (R. at 631.) The Bender Visual Motor Gestalt Test did not indicate the presence of organicity. (R. at 631-32.) However, Brewer's pace was inadequate as objectively tested, compared to premorbid pace as indicated in school records. (R. at 632.) Spangler diagnosed Brewer with average intelligence; cognitive disorder, not otherwise specified; long-term memory (recent events) impairment, moderate to severe; and slowed pace. (R. at 632.) He deemed his prognosis as guarded. (R. at 632.)

Spangler also completed a mental assessment, indicating that Brewer was mildly limited in his ability to maintain personal appearance, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 633-35.) He found that Brewer was moderately

limited in his ability to relate to co-workers, to use judgment, to interact with supervisors, to deal with work stresses, to function independently, to maintain attention/concentration and to understand, remember and carry out simple job instructions. (R. at 633-34.) Spangler also found that Brewer was markedly limited in his ability to follow work rules, to deal with the public and to understand, remember and carry out both detailed and complex job instructions. (R. at 633-34.) In support of his assessment, Spangler noted Brewer's diagnosis of cognitive disorder, the 17-point drop in Brewer's IQ testing since the age of six, his excellent graduation ranking of 38/193 and his moderate to severe long-term memory impairment for recent events. (R. at 634.) Spangler opined that Brewer's impairment met the listing for organic mental disorders, found at § 12.02.[4] (R. at 634.) He opined that Brewer would miss about one day of work monthly. (R. at 635.) Spangler based his findings on Brewer's cognitive disorder and long-term memory impairment. (R. at 634-35.)

Brewer was seen for an initial assessment at Lee Co. Behavioral Health Services on December 8, 2014, for symptoms of depression. (R. at 680-82.) He reported no prior psychiatric services. (R. at 680.) Brewer denied suicidal or homicidal ideations. (R. at 680.) He endorsed severe anxiety, worrying, indecisiveness, poor attention or concentration, decreased appetite, anger, blunted or flat affect, depressed mood, feeling worthless, hopelessness, loss of interest or pleasure, low self-esteem and insomnia. (R. at 680-81.) He was diagnosed with major depressive disorder and generalized anxiety, and his then-current Global Assessment of Functioning, ("GAF"),[5] score was placed at 55,[6] with his highest

---

[4] This was the listing in effect at the time of the ALJ's decision.

[5] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

and lowest in the previous six months being 60. (R. at 681.) Individual psychotherapy and a psychiatric referral were recommended. (R. at 682.) On December 17, 2014, Brewer stated that his "nerves [were] shot." (R. at 675.) He reported that he struggled with depression, anxiety and worry, and that he became so anxious at times, that he would shake all over. (R. at 675.) Brewer stated that he felt quite hopeless and helpless and did not enjoy going anywhere or doing anything. (R. at 675.) He denied thoughts of self-harm or harming others, as well as paranoia or hallucinations. (R. at 675.) On mental status examination, rapport was easily established, Brewer was alert and fully oriented, he had clear, coherent and relevant speech, he maintained good eye contact, no abnormal psychomotor activity was identified, he had a mildly depressed mood and a mildly anxious affect, cognitive function was grossly intact, he had an average general fund of information, judgment was good, and insight was fair, he answered questions readily and participated in treatment discussion and planning, and he denied auditory or visual hallucinations. (R. at 676.) Brewer was diagnosed with depressive disorder; anxiety disorder, not otherwise specified; and a then-current GAF score of 60. (R. at 676.) He was prescribed Celexa and Vistaril. (R. at 676.) On December 22, 2014, Brewer reported obsessive compulsive actions which interrupted his sleep. (R. at 673.) He stated that Celexa made him groggy, but the Vistaril did "ok." (R. at 673.) His mood and affect were agitated, but he had good eye contact. (R. at 673.)

On January 5, 2015, Brewer reported no real change in his obsessive compulsive tendencies. (R. at 672.) His mood and affect were congruent. (R. at 672.) On January 7, 2015, Brewer reported to the nurse practitioner that he

---

⁶ A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning...." DSM-IV at 32.

discontinued Celexa because it made him feel groggy and "emotionless." (R. at 670.) He reported continued anxiety and constant worry, but he denied suicidal or homicidal ideations, as well as auditory or visual hallucinations. (R. at 670.) Brewer was alert and oriented, pleasant and cooperative, and he interacted appropriately. (R. at 670.) He was casually dressed and adequately groomed, eye contact was good, thought processes were organized and logical, mood was euthymic, affect was mildly anxious, speech was clear with normal rate and rhythm, he answered questions adequately and participated in treatment discussion and decisions, and there was no evidence of psychosis and no evidence of suicidal or homicidal ideation. (R. at 670.) Paxil was prescribed. (R. at 670.)

On January 19, 2015, Brewer complained that Paxil made him "feel weird," and he could not sleep. (R. at 668.) He continued to report that he was anxious and worried all the time. (R. at 668.) He denied suicidal or homicidal ideations, as well as auditory or visual hallucinations. (R. at 668.) Brewer was alert and oriented, pleasant and cooperative, and he interacted appropriately. (R. at 668.) He was casually dressed and adequately groomed with good eye contact and logical and organized thought processes. (R. at 668.) Brewer's mood appeared mildly anxious with a congruent affect. (R. at 668.) His speech was clear with normal rate and rhythm. (R. at 668.) He answered questions adequately and participated in treatment discussion and decisions. (R. at 668.) There was no evidence of psychosis or suicidal or homicidal ideations. (R. at 668.) Brewer was prescribed BuSpar. (R. at 668.) A Discharge Summary was completed on April 20, 2015, noting that Brewer had not been seen since January 2015. (R. at 683.) His prognosis as of January 2015 was deemed to be fair. (R. at 684.) Brewer's diagnoses and GAF score remained unchanged. (R. at 685.)

Brewer continued to treat with Dr. Aguirre from September 2014 through May 2015. (R. at 698-851.) Over this time, he reported continued complaints of back pain, which he rated between a seven and eight on a 10-point scale. (R. at 698-851.) However, he consistently indicated that his pain medication was doing ok, that he was able to do some work around the house and that he was less irritable with pain medication. (R. at 698-99, 714, 779, 795, 812, 842, 845.) In January 2015, Brewer also stated that he could fix himself something to eat and walk without pain. (R. at 765.) Physical and mental status examinations over this time were essentially normal, including that Brewer was alert, oriented, cooperative and in no distress with a normal mood and affect, normal behavior, normal thought content and judgment, normal cognition and memory, a normal gait, and he was not anxious. (R. at 716, 733, 748, 767, 781, 797, 814, 828.) In September 2014, Brewer did have an abnormal gait. (R. at 828.) He endorsed situational depression over his inability to work, but he denied anxiety or nervousness. (R. at 796-97, 813, 828.) In October 2014, Brewer reported that he was considering returning to college to pursue a new career in electronics. (R. at 815.) Dr. Aguirre decreased Brewer's Roxicodone from four times daily to three times daily to assess for hyperalgesia.[7] (R. at 815.) In November 2014, Brewer reported that he was anxious and depressed, and Dr. Aguirre referred him to psychiatry. (R. at 797-98.) In December 2014, Brewer reported increased back pain, as well as ankle pain, for the previous month. (R. at 779.) Dr. Aguirre noted that Brewer's radicular symptoms were worsening on the decreased medication, and he returned Brewer to the four times daily dosing. (R. at 782.) In January 2015, Brewer reported that he was seeing a counselor every two weeks and that he had started Cymbalta, but had to stop due to side effects. (R. at 767.) However, he also

---

[7] Hyperalgesia is an abnormally heightened sensitivity to pain that can result from either injury to a body part or from the use of opioid pain killers. *See* https://www.healthline.com/health/hyperalgesia (last visited Mar. 22, 2019).

was taking Vistaril. (R. at 767.) In March 2015, Brewer reported that he was planning to attend community college in the fall. (R. at 734.)

In April 2015, Dr. Aguirre reduced Brewer's Roxicodone dosage to 20 mg four times daily to assess analgesic needs and to provide a "drug holiday." (R. at 717.) Brewer again reported plans to attend college in the fall. (R. at 717.) He also reported helping around the house. (R. at 717.) In May 2015, Brewer indicated that his pain medication did not last as long as when he was on 30 mg tablets. (R. at 698.) He also reported trouble sleeping, noting that pain woke him up. (R. at 698-99.) However, Dr. Aguirre stated that Brewer had adjusted to the medication change since his last visit and that Brewer reported that, overall, he was doing well. (R. at 701.) He noted that Brewer's pain was under good control, that he had increased function, that he had been getting out more with the warmer weather and that he would be traveling over the next week. (R. at 701.) Brewer stated that he had a girlfriend and that he interacted with family and friends. (R. at 702.) Over this time, Dr. Aguirre's diagnoses of Brewer consisted of lumbar radiculopathy and pain in the joint, multiple sites. (R. at 698, 701, 713, 730, 733, 745, 748, 760, 764, 778, 782, 794, 798, 811, 815, 829.) He continued Brewer on medication, with the minimal changes noted.

On September 4, 2015, Brewer saw Ava Martin, PMHNP-BC, a board certified psychiatric mental health nurse practitioner, at Jonesville Family Medical Center, to establish his new patient status. (R. at 869-72.) He reported that he would be out of pain medicine that day. (R. at 869.) He reported problems with sleep, stress, anger and anxiety. (R. at 869.) He further stated that he had no memory. (R. at 869.) On examination, Brewer was alert and in no acute distress. (R. at 870.) He had a euthymic mood and congruent affect, his eye contact was appropriate, he was oriented, thought process was intact, he had no paranoia or

delusions, judgment and insight were fair, his behavior was calm and cooperative, motor movements were unremarkable, his speech was regular, he had good articulation, his intellect was average, and he had no suicidal or homicidal ideation. (R. at 871.) Martin diagnosed depressive disorder, not elsewhere classified; anxiety state, unspecified; and insomnia, unspecified, and she prescribed Trazodone. (R. at 871.)

Brewer saw Brandon Bogle, Ph.D., a licensed psychologist, on September 10, 2015, for a behavioral health assessment. (R. at 853-54.) Brewer reported experiencing anxiety and depression resulting from not feeling like himself. (R. at 852.) He stated he was anxious because he was released from his previous pain management doctor on grounds he perceived to be unfair. (R. at 852.) Bogle diagnosed depressive disorder, not elsewhere classified; and anxiety state, unspecified. (R. at 854.)

On September 12, 2015, Brewer saw Dr. Joshua Yeary, D.O., at Western Lee CHC, to establish care with a new primary care physician. (R. at 925-27.) Brewer endorsed symptoms of back pain and joint pains, depression and anxiety. (R. at 926.) On physical examination, he was in no acute distress with a normal gait. (R. at 926.) He had appropriate judgment, good insight, proper orientation, an anxious mood and an agitated affect. (R. at 926.) Dr. Yeary diagnosed chronic pain due to trauma, and he noted that he would refer Brewer to pain management for further evaluation. (R. at 925-26.) Brewer was upset that he would not receive pain medication that day. (R. at 926.) Brewer returned to Dr. Yeary on September 17, 2015, and was again diagnosed with chronic pain due to trauma. (R. at 924.)

Brewer continued to see Martin through January 2016. Over this time, he complained that his "nerves [were] shot" and that Seroquel gave him "vivid crazy

nightmares." (R. at 858, 864, 929.) Mental status examinations revealed that he was alert and in no acute distress, his mood was euthymic with congruent affect, he had appropriate eye contact, he was oriented, he had intact thought process, no paranoia or delusions, he had fair judgment and insight, calm and cooperative behavior, unremarkable motor movements, regular speech, good articulation, average intellect and no suicidal or homicidal ideation. (R. at 857-58, 862, 865-66, 931.) On January 11, 2016, Brewer reported that he was "alright." (R. at 929.) Martin continued to diagnose depressive disorder, not elsewhere classified; insomnia, unspecified; major depressive disorder, recurrent episode, moderate; and generalized anxiety disorder, and she prescribed medications. (R. at 858, 862, 866, 931.)

Brewer presented to the Simpson Clinic, LLC, on October 5, 2015, to establish his status as a new patient for pain management. (R. at 917.) On November 5, 2015, he informed Dr. Harland Simpson, M.D., that he had no medication side effects and that his medication reduced his pain by half. (R. at 918.) He also reported that his current pain relievers resulted in better physical functioning, family relationships, mood, sleep patterns and overall functioning. (R. at 918.) By December 1, 2015, Brewer reported that he was "a lot better." (R. at 910.) He noted that he was applying for disability and that he continued to have bilateral shoulder pain, for which he was doing therapy exercises. (R. at 910.) Brewer reported improved sleep. (R. at 910.) He had difficulty raising his arms above his shoulders. (R. at 910.) He had joint pain and crepitation in both shoulders. (R. at 910.) Dr. Simpson noted that Brewer was improved, but he continued to get inadequate sleep. (R. at 910.) He increased his dosage of Nortriptyline. (R. at 910.) On December 10, 2015, Brewer reported doing well, noting increased activities all around and that he was able to keep the house clean. (R. at 903.) Dr. Simpson stated that medication allowed for good control of

Brewer's pain and increased activity. (R. at 903.) His sleep was improved, and he was rested. (R. at 903.) Brewer could raise his arms above his head, but he had positive joint pain of the left shoulder. (R. at 903.) Dr. Simpson concluded that Brewer was stable and improved, he advised him to join a gym, and he prescribed Mobic. (R. at 903.) On January 6, 2016, Brewer reported walking a mile three to four times weekly. (R. at 900.) On physical examination, there was no edema of the lower extremities, and sensation was intact in all extremities. (R. at 897.) Dr. Simpson found that Brewer was getting adequate pain relief, and he refilled his oxycodone. (R. at 897.) On February 3, 2016, Brewer again reported that he was walking a mile three to four days weekly. (R. at 887.) He continued to report that his medication reduced his pain by half and that he experienced no adverse side effects. (R. at 891.) He reported that he had been okay since his previous visit, noting that his pain medication enabled him to perform activities of daily living more easily. (R. at 887.) Cranial nerves were grossly intact, but Brewer ambulated slowly. (R. at 887.) He had joint pain in the thoracic/lumbar spine and right sacroiliac joint deep tendon reflexes were 2+. (R. at 887.) Brewer had no edema of the lower extremities and intact sensation of all extremities. (R. at 887.) Dr. Simpson's nurse practitioner concluded that Brewer's condition was stable and that he was receiving adequate pain relief. (R. at 887.) His oxycodone was refilled. (R. at 887.)

On December 4, 2015, Dr. Leigh Anne Young, M.D., completed a physical assessment of Brewer, finding that he could lift/carry items weighing up to 10 pounds both occasionally and frequently, that he could stand/walk for less than one hour in an eight-hour workday, but for only 20 minutes without interruption, that he could sit for one hour in an eight-hour workday, but for 30 minutes without interruption, that he could occasionally balance, but never climb, stoop, kneel, crouch or crawl, that his abilities to reach, to handle, to feel, to see, to hear and to

speak[8] were affected by his impairment and that he could not work around temperature extremes, chemicals, dust, noise, fumes or humidity.[9] (R. at 876-78.) Dr. Young opined that Brewer would miss more than two days of work monthly due to his impairment(s). (R. at 878.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2018). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2018).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that

---

[8] Dr. Young checked "Yes" for all of these categories and "No" for "Push/Pulling." However, it appears that Dr. Young likely intended to indicate that this was the category in which Brewer was restricted, as her explanation for her finding was that Brewer had trauma to both shoulders, limiting his ability to push and pull. (R. at 877.)

[9] Dr. Young indicated "No" for "Heights," "Moving Machinery" and "Vibration." However, it appears that she likely intended to indicate that these were the categories in which Brewer was restricted, as her explanation for her finding was that Brewer had poor balance due to pain from multiple traumatic injuries, and he had a loss of light touch sensation in both feet. (R. at 878.)

the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011, West 2012 & 2018 Supp.); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(c), 416.927(c), if she sufficiently explains her rationale and if the record supports her findings.

Brewer argues that the ALJ improperly determined his residual functional capacity. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-7.) In particular, Brewer argues that the ALJ erred by giving little weight to the opinion of Dr. Young, his treating physician. (Plaintiff's Brief at 6.) He further argues that the ALJ erred by failing to specify what weight she was giving to Spangler's uncontested opinion and by failing to provide an explanation as to why she discounted Spangler's opinion that Brewer's impairment met the criteria of a listed impairment. (Plaintiff's Brief at 6.)

I first will address Brewer's argument as it pertains to Dr. Young's opinion. In her opinion, the ALJ stated that she was giving Dr. Young's opinion little weight. (R. at 22, 24.) First, despite Brewer's contention that Dr. Young is his treating physician, as well as the Commissioner's reference in her brief to Brewer having received treatment from Dr. Young at the Simpson Clinic from October 2015 to December 2015, the only note from Dr. Young that the court can locate is the December 4, 2015, medical assessment. The treatment notes dated October 2015 through December 2015 referenced by the Commissioner are signed by Dr. Simpson, and the other treatment notes from the Simpson Clinic are neither signed by Dr. Young nor reference her in any way. Thus, as an initial matter, I cannot find that Dr. Young is Brewer's treating physician. In Dr. Young's assessment, which is a check-box form, Dr. Young opined that Brewer could lift/carry items weighing up to 10 pounds both occasionally and frequently, sit for a total of one hour in an eight-hour workday, but for 30 minutes without interruption, stand/walk for a total of less than one hour in an eight-hour workday, but for 20 minutes without interruption, never climb, stoop, kneel, crouch or crawl, occasionally balance, was limited in his ability to reach, to handle, to feel, to see, to hear and to speak, was limited in his ability to be exposed to chemicals, dust, noise, fumes, humidity and temperature extremes and would be expected to be absent from work more than

two days monthly. (R. at 876-78.) I first note that such check-box forms are not entitled to great weight. *See Gerette v. Colvin*, 2016 WL 1296082, at *6 (W.D. Va. Mar. 30, 2016) (form reports, in which a physician's only obligation is to check a box or fill in a blank, are entitled to little weight in the adjudication process); *Walker v. Colvin*, 2015 WL 5138281, at *8 (W.D. Va. Aug. 31, 2015) (checkbox forms are of limited probative value); *Ferdinand v. Astrue*, 2013 WL 1333540, at *10 n.3 (E.D. Va. Feb. 28, 2013) (check-the-box forms are weak evidence at best); *Leonard v. Astrue*, 2012 WL 4404508, at *4 (W.D. Va. Sept. 25, 2012) (check-the-box assessments without explanatory comments are not entitled to great weight, even when completed by a treating physician). Additionally, I find that some of the restrictions contained in Dr. Young's assessment appear to have been mistakenly recorded, as described earlier, thereby calling into doubt the credibility of Dr. Young's findings in general. Moreover, as Dr. Young is not listed as the provider on any treatment record before the court, I find that she is a nontreating and nonexamining provider under the regulations, whose opinion is, generally, entitled to less weight. *See* 20 C.F.R. §§ 404.1527(c)(1)-(2), 416.927(c)(1)-(2) (2018). Lastly, I find that Dr. Young's restrictive findings are not supported by the other evidence of record. For instance, Dr. Young's restrictions on Brewer's abilities to stand/walk and to sit are not supported by the contemporaneous treatment notes from the Simpson Clinic. On December 1, 2015, just three days prior to Dr. Young's assessment, Brewer had reported that he was doing "a lot better." (R. at 910.) Likewise, on December 10, 2015, he reported doing well since his last visit, with increased activities all around. (R. at 903.) In particular, he reported good pain control with medication, which allowed increased activity, including being able to keep the house clean. (R. at 903.) In January 2016, Brewer reported walking a mile three to four times weekly, noting that pain medication enabled him to perform activities of daily living more easily. (R. at 897.) In February 2016, Brewer again reported doing "okay" since his last visit and walking a mile three to four times

weekly. (R. at 887.) He again stated that his pain medication enabled him to perform activities of daily living more easily. (R. at 887.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

Other treatment notes from 2015 also do not support Dr. Young's restrictive findings. From the period of January 2015 through May 2015, Brewer saw Dr. Aguirre for pain management. Over this time, Brewer consistently reported that his pain medication was doing okay, that he was able to do some work around the house, he could fix himself something to eat and walk without pain. In March and April 2015, he reported plans to attend college in the fall. (R. at 717, 734.) In April 2015, Brewer reported helping around the house. (R. at 717.) After Dr. Aguirre reduced Brewer's pain medication in April 2015, Brewer did complain that he was not getting pain relief that lasted as long and that pain woke him up at night. (R. at 698-99.) However, Brewer reported that, overall, he was doing well, and Dr. Aguirre found that Brewer's pain was under good control, that he had increased function, that he had been getting out more with the warmer weather and that he had plans to travel over the following week. (R. at 701.) Brewer reported that he had a girlfriend and that he interacted with family and friends. (R. at 702.) In September 2015, Dr. Yeary noted that Brewer was in no acute distress, and he had a normal gait. (R. at 926.)

It is for all of the above-stated reasons that I find that substantial evidence supports the ALJ's decision to accord little weight to the December 4, 2015, opinion of Dr. Young.

Brewer next argues that the ALJ erred by failing to specify what weight she was giving to Spangler's uncontested opinion. (Plaintiff's Brief at 6.) I am not

persuaded by this argument. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 440. "[T]he Commissioner must indicate explicitly that all relevant evidence has been weighed and its weight." *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). "The courts, however, face a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all relevant evidence and has sufficiently explained the weight [s]he has given to obviously probative exhibits, to say that [her] decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

While the ALJ did not explicitly state the weight she was giving to the opinion of Spangler, I find that any error made in this regard was harmless, as she thoroughly analyzed all of the relevant evidence pertaining to Brewer's mental health diagnoses and their resulting effects on his ability to work. I further find that substantial evidence supports the ALJ's mental residual functional capacity finding.

First, despite the ALJ's failure to explicitly state in her decision what weight she was giving to Spangler's opinion, any such error was harmless. The Fourth Circuit has held that the harmless error rule applies to Social Security Disability appeals. *See Tanner v. Comm'r of Soc. Sec.*, 602 F. App'x 95, 101 (4th Cir. 2015) (finding failure to explicitly assign weight to treating physician to constitute

harmless error); *James v. Colvin*, 2014 WL 4630598, at *15 (E.D. Va. Sept. 11, 2014). The burden of establishing a harmful error rests on "the party attacking the agency's determination." *Keaton v. Colvin*, 2016 WL 8452663, at *6 (E.D. Va. July 11, 2016) (quoting *Shineski v. Sanders*, 556 U.S. 396, 409 (2009)).

Spangler opined that Brewer was markedly limited in his abilities to follow work rules, to deal with the public and to understand, remember and carry out both detailed and complex job instructions. In her decision, the ALJ limited Brewer to understanding, remembering and carrying out simple instructions in repetitive, unskilled work that did not involve more than occasional interaction with the general public. (R. at 20.) Such findings accounted for Spangler's restrictions. The ALJ thoroughly discussed Spangler's opinion in her decision. (R. at 22-23.) Moreover, the error did not harm Brewer because the ALJ found that Brewer had severe mental impairments that resulted in work-related limitations, which she integrated into the residual functional capacity determination. The court finds it highly unlikely that if the ALJ had assigned specific weight to Spangler's opinion, her ultimate conclusion would have been any different. Additionally, the ALJ's error does not impede this court's ability to conduct a meaningful review of the ALJ's decision. Brewer cannot point to any harm resulting from the ALJ's failure to assign specific weight to Spangler's opinion. Therefore, the court finds that any error the ALJ may have committed by failing to explicitly state the weight she was giving it constituted a harmless error. *See Tanner*, 602 F. App'x at 101 ("[R]eversing the ALJ's decision solely because he failed to assign weight to [the treating physician's] opinion would be pointless. As noted above, the RFC assessment and [the treating physician's] opinion are largely consistent.").

The court further finds that substantial evidence supports the ALJ's finding that Brewer's impairment(s) did not meet the listing for organic mental disorders,

found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.02, contrary to the opinion of psychologist Spangler. In order to meet the criteria for listing § 12.02, Brewer must satisfy the requirements in both (A) and (B) or the requirements in (C) below.

    (A) Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:

        (1) Disorientation to time and place; or

        (2) Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past; or

        (3) Perceptual or thinking disturbances (e.g., hallucinations, delusions); or

        (4) Change in personality; or

        (5) Disturbance in mood; or

        (6) Emotional lability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or

        (7) Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., the Luria-Nebraska, Halstead-Reitan, etc.;
        AND

    (B) Resulting in at least two of the following:

        (1) Marked restriction of activities of daily living; or

        (2) Marked difficulties in maintaining social functioning; or

        (3) Marked difficulties in maintaining concentration, persistence, or pace; or

        (4) Repeated episodes of decompensation, each of extended duration;
        OR

    (C) Medically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

        (1) Repeated episodes of decompensation, each of extended duration; or

        (2) A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

(3) Current history of 1 or more years' inability to function outside a
highly supportive living arrangement, with an indication of continued
need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.02 (2016).[10] I find that the only arguable
section that Brewer could meet would include (A)(7), given the 17-point drop in
IQ testing scores from premorbid measures. However, I further find that the
evidence does not support a finding of the (B) criteria of § 12.02. For reasons
already stated herein, Brewer does not have marked restriction of activities of daily
living. No medical source has found that he has marked difficulties in maintaining
social functioning, in maintaining concentration, persistence or pace or that he has
experienced repeated episodes of decompensation of extended duration, including
psychologist Spangler. All of this being the case, I find that substantial evidence
supports the ALJ's finding that Brewer's impairment(s) do not meet the criteria of
§12.02.

The court also finds that substantial evidence supports the ALJ's mental
residual capacity finding, as set out above. In particular, the medical records reflect
that, on mental status examinations, Brewer consistently was alert, oriented,
cooperative, had normal behavior, judgment, thought content, cognition and
memory. He also, generally, had a normal mood and affect, but, at times, it was
noted to be anxious. Brewer consistently reported that pain medication made him
less irritable. Although he reported some depression, it was described as
situational. The state agency psychologist found that Brewer had no serious mental
status abnormalities. In September 2014, despite endorsing severe depressive and
anxiety symptoms, Brewer had a GAF score of 55, indicating moderate symptoms.
In December 2014, his mood was only mildly depressed, and he had only a mildly
anxious affect. The remainder of the mental status examination was normal,

--------
[10] This is the listing that was in effect at the time of the ALJ's decision.

including a GAF score of 60. In January 2015, mental status examination, again, was normal with the exception of a mildly anxious affect. In September 2015 and October 2015, Brewer complained of stress, anger, anxiety and memory difficulty, but Martin noted a normal mental status examination. By January 2016, Brewer reported to Martin that he was "alright."

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  Substantial evidence exists in the record to support the ALJ's weighing of the medical evidence with regard to Dr. Young's assessment;

2.  The ALJ committed harmless error by failing to explicitly state the weight she was giving to the opinion of psychologist Spangler;

3.  Substantial evidence exists in the record to support the ALJ's finding that Brewer's impairment(s) do not meet the criteria of § 12.02 for organic mental disorders;

4.  Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

5.  Substantial evidence exists in the record to support the Commissioner's finding that Brewer was not disabled under the Act and was not entitled to DIB and SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Brewer's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. §
636(b)(1)(C) (West 2018):

>Within fourteen days after being served with a copy [of this
Report and Recommendation], any party may serve and file written
objections to such proposed findings and recommendations as
provided by rules of court. A judge of the court shall make a de novo
determination of those portions of the report or specified proposed
findings or recommendations to which objection is made. A judge of
the court may accept, reject, or modify, in whole or in part, the
findings or recommendations made by the magistrate judge. The judge
may also receive further evidence or recommit the matter to the
magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and
recommendations within 14 days could waive appellate review. At the conclusion
of the 14-day period, the Clerk is directed to transmit the record in this matter to
the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and
Recommendation to all counsel of record at this time.

DATED:    March 22, 2019.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE